NOT DESIGNATED FOR PUBLICATION

No. 128,131

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JAMES KOMAKECH,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JEFFREY SYRIOS, judge. Submitted without oral argument. Opinion filed July 10, 2026. Conviction affirmed, sentence vacated, and case remanded with directions.

*James M. Latta*, of Kansas Appellate Defender Office, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before WARNER, C.J., HURST and BOLTON FLEMING, JJ.

PER CURIAM: Following a bench trial in two consolidated cases, the district court convicted James Komakech of aggravated criminal sodomy for his actions in one case and domestic battery for his actions in the other. On appeal, Komakech claims that the State presented insufficient evidence to support his conviction for aggravated criminal sodomy, and that the district court erred in assessing his criminal history score.

Contrary to Komakech's claims, the victim's testimony in conjunction with the other circumstantial evidence was sufficient to sustain his conviction for aggravated

1

criminal sodomy. The victim's testimony was not so incredible as to render it insufficient to sustain his conviction. However, as the State agrees, additional information is necessary to ensure Komakech's criminal history score was accurately assessed. Therefore, Komakech's conviction is affirmed and his sentence is vacated and the case is remanded for reconsideration of his criminal history score.

FACTUAL AND PROCEDURAL BACKGROUND

In March 2019, the State charged Komakech with aggravated criminal sodomy and domestic battery related to events that occurred between January 31 and February 1 under case No. 19CR562, which are described herein. The State also charged Komakech under case No. 19CR558 with kidnapping and domestic battery in connection with another incident involving the same victim, Cate (a pseudonym), that occurred on February 20.

On Komakech's motion, the cases were consolidated for trial. The cases proceeded to a bench trial where Komakech was found guilty of aggravated criminal sodomy in one case and domestic battery in the other. Komakech's appeal includes a claim that the State presented insufficient evidence to support his conviction for aggravated criminal sodomy, which requires this court to evaluate the facts supporting that conviction. The facts relevant to Komakech's conviction for domestic battery in the other case are not relevant here.

Cate and Komakech had been in a romantic relationship that had apparently ended. After some time apart, while Cate was staying out of town, Komakech agreed to meet Cate and her daughter in Russell to drive Cate back to Wichita. At some point during the ride, the two began arguing and Komakech physically and sexually assaulted Cate.

Cate testified that she could not recall what she and Komakech argued about because she had been "drinking a little" and was "on [her] way to being intoxicated." During the ride Cate's clothes came off, but she could not recall how and testified that she may have removed her pants because she peed in them, but her shirt was "basically ripped off of [her]." Komakech disputed Cate's account of the events, and testified that Cate removed her clothes herself about 20 minutes into the ride. Cate described the drive as "very physical" and testified that Komakech strangled her and hit her. Cate said that at some point, the two pulled off on the side of the road and she tried to flee, but Komakech chased her, picked her up, spanked her like a child, and put her back in the car.

Cate testified that after stopping for gas in Park City, Komakech drove the car around to a truck stop and pulled his penis out. Cate said Komakech forced her to put her mouth on his penis over her pleading "please don't do this." According to Cate, Komakech "had [her] by [her] hair," and as he was ejaculating, he "shoved [her] mouth even further down on to his penis."

Cate said that when Komakech dropped her off at her ex-husband's house, she was "out of it," due to exhaustion; though she was "definitely feeling the alcohol," she testified that she was not "completely intoxicated." Cate's ex-husband called 911 for an ambulance, and one of the responding officers testified that he "immediately noticed that [Cate] had a lot of physical injuries to her body."

Another officer responded to the hospital where he interviewed Cate. That officer testified that Cate's face was swollen and she had injuries to the top of her chest, her arms, her legs, and her jawline. The officer said he could tell Cate "had been beaten up pretty good" and was "kind of lethargic, kind of trying to figure out what was going on." Cate told the officer that Komakech forced her to perform oral sex on him by "dragging her in the back of her head and shoving her head down into his lap," and she pleaded with Komakech not to do it.

3

A forensic nurse at Wesley Medical Center performed a sexual assault examination of Cate around 5:19 a.m. When the nurse arrived, Cate was unable to stay awake between questions, but the nurse testified that Cate was "alert and oriented" when she was talking. Cate denied genital or anal penetration, but she reported the oral sexual assault, and the nurse swabbed Cate's mouth for genetic material. The nurse also completed a physical examination and later documented physical markings and injuries on a body diagram, which the nurse described at trial, including:

- Redness throughout Cate's ears and a 2 centimeter, red abrasion on her right cheek;
- an area of red-patterned bruising and red linear abrasion on her left thigh and brown/red circular bruising on her left knee;
- a 1 centimeter, circular red/brown bruise on the back of her left hand;
- a 4 centimeter by 4 centimeter area of red/brown circular bruising on her left forearm;
- a 1 centimeter by 2 centimeter area of purple bruising, an 8 centimeter and a 4 centimeter red linear abrasion on her left inner arm;
- two small red abrasions on her right buttock;
- blue/purple/red bruising on her left and back thigh area and a 6 centimeter by 6 centimeter area of purple bruising on the side of her leg on the left;
- a 2 centimeter by 3 centimeter area of red/brown bruising and a 1 centimeter by 1.5 centimeter red bruising area with abrasion on her right outer thigh;
- an area of red abrasions, red linear abrasions, and red bruising throughout her chest area;
- a 5 centimeter by 8 centimeter area of blue/purple/red bruising with petechia on her left upper-chest area;
- a 6 centimeter by 7 centimeter area of multiple red linear abrasions and bruising on her right upper chest area.

4

At trial, the State showed the images of Cate's injuries taken at the hospital.

The nurse testified that Cate said Komakech had strangled her, and the nurse testified that scratch marks on Cate's neck appeared consistent with a "victim trying to pull the—whoever strangled them, their hands off." In the nurse's experience and opinion, Cate's injuries and symptoms were consistent with Cate being beaten, strangled, and sexually assaulted.

A few hours after Cate's sexual assault exam, another officer interviewed Cate and noted that she seemed tired and unable to focus well. According to that officer, Cate said that Komakech had forcibly grabbed her hair and pushed her head down and forced his penis into her mouth while she pleaded with him not to. Cate reported to the officer and testified at trial that afterward she had spit the semen in the car.

DNA testing on oral swabs taken from Cate revealed the presence of a prostate-specific antigen indicating—but not definitively proving—the presence of semen. According to the forensic report, semen was detected on fabric samples labeled "'driver's side back seat'" and "'front pass backrest.'" The DNA profiles obtained from the sperm cell fractions swabbed from the car's fabric were "consistent with the profile of . . . Komakech."

In case 19CR562, described above, the district court found Komakech guilty of aggravated criminal sodomy but not guilty of domestic battery. In 19CR558, the court found Komakech guilty of domestic battery but not guilty of kidnapping. On December 22, 2021, the district court sentenced Komakech to 176 months in prison for 19CR562. For case 19CR558, he was sentenced to 6 months in county jail, and a $200 fine. The district court ordered the sentences be served concurrently, creating a controlling sentence of 176 months and $200 in fines.

5

Komakech brings two claims on appeal. First, Komakech argues that the State failed to present sufficient evidence to support his aggravated criminal sodomy conviction. Second, Komakech contends that the district court erred by sentencing him with an incorrect criminal history score. Both claims are properly preserved for appeal.

I.      SUFFICIENT EVIDENCE SUPPORTS KOMAKECH'S CONVICTION

Komakech attacks the sufficiency of the State's evidence with two arguments. First, he argues that the State failed to present sufficient evidence to prove the "technical legal definition" of sodomy. Second, he argues Cate's testimony was so incredible and improbable that it defies belief and thus requires reversal of his conviction.

"The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires proof beyond a reasonable doubt of every element of the crime charged. It also requires fact-finders to rationally apply the proof-beyond-a-reasonable-doubt standard to the facts in evidence." *State v. Sieg*, 315 Kan. 526, 530, 509 P.3d 535 (2022). Thus, when a criminal defendant challenges the sufficiency of the evidence, this court reviews the evidence in the most favorable light to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. 315 Kan. at 530; see also *State v. Mendez*, 319 Kan. 718, 723, 559 P.3d 792 (2024). To the extent this court's review requires statutory interpretation, that review is unlimited, giving no deference to the district court's interpretation. See *State v. Pepper*, 317 Kan. 770, 777, 539 P.3d 203 (2023) (review is unlimited insofar as the issue requires statutory interpretation); *Sieg*, 315 Kan. at 531.

An appellate court does not "reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses." *Mendez*, 319 Kan. at 723; see also *Pepper*, 317

Kan. at 777. Instead, "[a] reviewing court need only look to the evidence in favor of the verdict to determine whether the essential elements of a charge are sustained." *State v. Zeiner*, 316 Kan. 346, 350, 515 P.3d 736 (2022).

*The State presented sufficient evidence of sodomy.*

Komakech only challenges the sufficiency of the evidence sustaining his conviction for aggravated criminal sodomy. The charging document alleged that Komakech "unlawfully engage[d] in sodomy with [Cate] or cause[d] [Cate] to engage in sodomy with any person or animal, without [Cate's] consent under circumstances when [Cate] was overcome by force or fear." Komakech was found guilty of aggravated criminal sodomy under K.S.A. 2018 Supp. 21-5504(b)(3)(A), which is "sodomy with a victim who does not consent to the sodomy or causing a victim, without the victim's consent, to engage in sodomy with any person or an animal . . . [w]hen the victim is overcome by force or fear." K.S.A. 2018 Supp. 21-5504(b)(3)(A).

Sodomy is defined as "oral contact or oral penetration of the female genitalia or oral contact of the male genitalia; anal penetration, however slight, of a male or female by any body part or object . . . ." K.S.A. 21-5501(b). Komakech contends the State failed to prove he committed aggravated criminal sodomy because the conduct at issue did not constitute "oral contact of the male genitalia." The trial evidence described Komakech's forcible penetration or insertion of his genitalia into the victim's mouth, and no other form of sodomy.

According to Komakech, because the statute prohibits forcible "oral contact *or oral penetration*" of the female genitalia but does not also include "oral penetration" of the male genitalia—merely "oral contact of the male genitalia"—it must not include oral penetration by the male genitalia. (Emphasis added.) Therefore, Komakech contends that when it comes to oral sodomy involving male genitalia, forcible penetration of the male

genitalia into a mouth is not aggravated criminal sodomy and only forcible "oral contact of the male genitalia" constitutes aggravated criminal sodomy.

Komakech apparently argues that forcible oral penetration can occur without oral contact and that the Kansas Legislature intended to distinguish between forcible oral penetration and forcible oral contact, criminalizing only the latter. This argument requires this court to interpret the aggravated criminal sodomy statute to determine the Legislature's intent. *State v. Keys*, 315 Kan. 690, 698, 510 P.3d 706 (2022) ("The most fundamental rule of statutory interpretation is that the Legislature's intent governs if we can ascertain that intent."). On appeal, the court first attempts to determine legislative intent through the statutory language enacted, giving common words their ordinary meanings. 315 Kan. at 698. When a statute is plain and unambiguous, an appellate court should refrain from reading something into the statute that is not readily found in its words. 315 Kan. at 698.

First, Komakech's argument relies on a basic misreading of the statute. The statute defines sodomy as "oral contact or oral penetration *of* the female genitalia" and "oral contact *of* the male genitalia." (Emphases added.) K.S.A. 21-5501(b). The statute contemplates that the female genitalia can be both orally contacted and orally penetrated. However, as basic anatomy dictates—the penis is not readily orally penetrated. Therefore, a basic anatomical reality resolves Komakech's concern about the difference in phrasing between these two parts of the statute. Additionally, Komakech's argument that "oral contact of the male genitalia" excludes forcible oral penetration *by* the male genitalia into the mouth of another ignores the plain language of the statute that criminalizes forcible oral contact of the male genitalia and asks this court to read an exclusion into the statute that is not there. Therefore, Komakech's argument that the Legislature's failure to include forcible penetration *of* the male genitalia *by* another's mouth also means the Legislature excluded forcible penetration *of* another's mouth *by* male genitalia and is not only illogical but unsupported by the statutory language.

8

Second, and once again quite logically, forcible "oral contact of the male genitalia"—which constitutes aggravated criminal sodomy—necessarily occurs when the male genitalia forcibly penetrates another's mouth. It is difficult to imagine how Komakech could accomplish forcibly inserting his genitalia into the victim's mouth without the victim's mouth having "contact of" his genitalia. The Kansas Supreme Court has explained that "'oral contact or oral penetration of the female genitalia or oral contact of the male genitalia' . . . refers to various types of oral contact of either the male or female genitalia" and that while "the definition refers to both oral 'contact' and oral 'penetration' of the female genitalia, since oral penetration of the female genitalia would seemingly always involve oral contact with the female genitalia, those terms are both encompassed within the definition of oral contact." *State v. Britt*, 295 Kan. 1018, 1025, 287 P.3d 905 (2012).

The *Britt* court concluded that the State presented sufficient evidence of aggravated criminal sodomy by proving that the defendant forced the victim to "engage in oral contact with his genitalia." 295 Kan. at 1025. Komakech notes the similarities between this case and *Britt*, but contends *Britt* was wrongly decided. Not only is this court duty bound to follow Kansas Supreme Court precedent—but this court finds no error in the district court's conclusion that forcible penetration of another's mouth by the male genitalia constitutes "oral contact of the male genitalia" and thus aggravated criminal sodomy. See *State v. Patton*, 315 Kan. 1, 16, 503 P.3d 1022 (2022) (The Kansas Court of Appeals is duty bound to follow Kansas Supreme Court precedent unless there is some indication that the Supreme Court is departing from its previous position.); see also *Britt*, 295 Kan. at 1025 (defendant forcing victim to engage in oral contact with his genitalia constituted aggravated criminal sodomy). Moreover, other panels of this court have concluded the same. See, e.g., *State v. Dishner*, No. 120,422, 2020 WL 593907, at *1 (2020) (unpublished opinion) ("During the trial, the State presented evidence that Dishner coerced D.T. to fellate him one time. That act is a form of sodomy, as defined in the criminal code.").

9

Evidence that Komakech penetrated the victim's mouth with his penis is sufficient to meet the definition of sodomy under K.S.A. 2018 Supp. 21-5501(b).

*The victim's testimony was not so incredible as to render the evidence insufficient to sustain his conviction.*

In Komakech's second argument related to the sufficiency of the evidence, he contends that the victim's testimony so lacked credibility as to make it insufficient to sustain his conviction. This is an argument that straddles the line between a legal sufficiency argument and a request for this court's reassessment of the victim's credibility. See *Zeiner*, 316 Kan. at 350 (discussing the reversibility of a conviction based on incredible testimony). When reviewing the sufficiency of the evidence, this court does not replace the factfinder by resolving conflicts in evidence or reweighing evidence or witness credibility determinations. 316 Kan. at 350. While the evidence can be so lacking as to render it insufficient, "[i]t is only in rare cases where the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt that a guilty verdict will be reversed." 316 Kan. at 350.

Komakech's arguments do not allege a lack of evidence but that the victim's memory issues, intoxication, and medical history render her testimony so incredible and improbable as to defy belief. In support of his argument, Komakech cites an aged case in which the defendant was convicted of rape based on uncorroborated and contradicted victim testimony. See *State v. Matlock*, 233 Kan. 1, 3, 660 P.2d 945 (1983). On appeal in *Matlock*, the Kansas Supreme Court identified 14 facts admitted or uncontroverted which tended to cast doubt on the victim's testimony. 233 Kan. at 4-5. The Supreme Court held that the uncontradicted facts of the case cast "so much doubt upon the credibility of the prosecutrix that no rational factfinder could have believed her testimony and found the defendant guilty beyond a reasonable doubt," and the court reversed the defendant's rape conviction based on insufficient evidence. 233 Kan. at 5-6. The court emphasized that

uncorroborated testimony *can* be sufficient evidence to convict a defendant of rape, but the testimony must be "convincing to the point that a rational factfinder could find the defendant guilty beyond a reasonable doubt." 233 Kan. at 6.

This court notes that despite the outcome in *Matlock*, Kansas appellate courts have consistently affirmed the sufficiency of uncorroborated victim testimony supporting sexual assault and rape convictions. See, e.g., *State v. Gibson*, 246 Kan. 298, 303-04, 787 P.2d 1176 (1990) ("We have consistently held that a conviction of rape may be upheld solely upon the testimony of the victim without any corroboration."); *State v. Sanders*, 227 Kan. 892, Syl. ¶ 2, 610 P.2d 633 (1980) ("The testimony of the prosecutrix need not be corroborated to sustain a conviction for rape in this state; there may be a conviction on the uncorroborated evidence of the prosecutrix if it is believed by the jury."); *State v. Ferguson*, No. 69,849, 1994 WL 17120738, at *6 (Kan. App. 1994) (unpublished opinion). The outcome in *Matlock* demonstrates an exceptional circumstance of uncorroborated testimony that other evidence undermined, and this case is readily distinguishable. Unlike in *Matlock*, here the victim immediately:

- reported the assault,

- had consistent statements about what occurred,

- had physical evidence supporting the allegations,

- and there was no evidence of the victim having a motive or intent to lie,

- and (other than Komakech) no witnesses undermined the victim's testimony.

While the victim here was intoxicated, tired, and had some memory problems—that evidence goes to the victim's credibility and was available to the trier of fact. See

11

*Gibson*, 246 Kan. at 303 ("'It is not our function to determine the credibility of witnesses even if there is evidence which could have caused the jury not to believe the witness.'") (citing *State v. Hammon*, 245 Kan. 450, Syl. ¶ 3, 781 P.2d 1063 [1989]). Cate admitted to drinking before she got into Komakech's car, being "buzzed" when the ride began, and becoming more intoxicated during the ride due to her earlier drinking. Cate stated that she was "out of it" when Komakech dropped her off at her ex-husband's house and that she was "definitely feeling the alcohol." Cate also testified that it was difficult to remember the incident because she was using drugs at the time and because she had a stroke in 2020. The forensic nurse, the officer who interviewed Cate at the hospital, and the officer who interviewed Cate just after her discharge at the hospital all made observations about Cate's lethargic, weary, and jumbled demeanor.

Even with these circumstances that Komakech asserts undermine Cate's testimony—he points to no inconsistencies, contrary evidence, or nefarious motive undermining Cate's testimony. In addition to the victim's statements, physical condition, and testimony, there was other relevant evidence for the factfinder to consider.

A friend of Komakech's testified that Komakech called him during the drive and the friend heard screaming and yelling in the background. Additionally, an eyewitness testified at trial that she called 911 after witnessing Komakech in a vehicle in Park City with a female passenger. The witness thought the position and behavior of the vehicle was suspicious, and that someone inside was having a medical emergency. Komakech ignored her when she pulled up and repeatedly asked if everything was okay. The witness said the passenger was motionless and that when the vehicle moved, the passenger's head hit the windshield. As Komakech points out, there were some inconsistencies from this witness testimony—namely that although she identified Komakech at trial, she identified the vehicle in her 911 call as a white Ford with a tag beginning with "45," but all other evidence suggests Komakech was driving a white GMC with tag beginning "B6." Finally, there was forensic evidence supporting Cate's testimony, although Komakech alleged that

12

the DNA evidence could be explained from his prior sexual encounters with Cate in his car.

At trial, Komakech generally denied Cate's allegations and testified that Cate tried to have sex with him during the car ride. Komakech also testified that he did not notice any marks or physical injuries on Cate's body during the car ride and said that he had seen Cate scratch herself when she was upset on prior occasions, though he did not see her scratch herself on the night in question. He added that he saw some bruises on Cate's arms and wrists in November or December 2018—at least two months before the night in question.

The defense also attacked Cate's credibility and characterized her as a drug addict, a prostitute, and a schizophrenic suffering from occasional delusions. The defense argued that Cate had reason to fabricate the allegations because she was homeless, desperate, and believed Komakech was done with their intimate relationship. The defense argued Komakech did not notice injuries on Cate because he was not looking for them, and because Cate could have become injured by rolling around in his vehicle and acting crazy during the ride.

Although Cate was intoxicated the night of the assault, had some memory problems, and was lethargic, these characteristics did not render her testimony "so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt." *Zeiner*, 316 Kan. at 350. Cate's account of Komakech's assault was consistent and not otherwise undermined by evidence other than Komakech's testimony. While these characteristics might call Cate's testimony and credibility into question—the determination of the weight of the evidence and witness credibility is for the trier of fact. See *State v. Jackson*, 280 Kan. 16, 39-40, 118 P.3d 1238 (2005) ("The jury is responsible for weighing the evidence and passing on the credibility of witnesses. An appellate court does not invade the province of the jury by reweighing the evidence or determining the

credibility of the witnesses."); see also *Gibson*, 246 Kan. at 303 ("'It is not our function to determine the credibility of witnesses even if there is evidence which could have caused the jury not to believe the witness.'") (citing *Hammon*, 245 Kan. 450, Syl. ¶ 3).

In short, the State presented sufficient evidence upon which a rational factfinder could have found Komakech guilty of aggravated criminal sodomy beyond a reasonable doubt.

## II.   KOMAKECH'S CRIMINAL HISTORY SCORE NEEDS RECONSIDERATION

Komakech also appeals the district court's criminal history score determination, and fortunately the State agrees that "the case should be remanded to more fully assess defendant's criminal history." However, the parties disagree about the scope of that remand.

Relevant to the district court's sentencing decision, the trial also included evidence from case 19CR558 where the State charged Komakech with felony kidnapping and misdemeanor domestic battery. The State alleged that the crimes took place on February 20, 2019, and that the alleged victim was again Cate. The underlying evidence is not relevant to the issues here other than that based on the evidence, the district court acquitted Komakech of kidnapping but convicted him of domestic battery in that case.

At sentencing in both cases, the district court announced Komakech's criminal history score of H. The criminal history score calculated in the Presentence Investigation Report (PSI) included 10 prior convictions—eight were classified as adult misdemeanor unscored offenses and two were classified as adult misdemeanor nonperson offenses. The two adult misdemeanor nonperson offenses were offense number 5 (no proof of insurance) and number 10 (driving while suspended).

14

When asked if the parties agreed with the criminal history score of H, defense counsel replied, "Not precisely, Your Honor. Some of those misdemeanors, in fact, all of them, are traffic infractions and possibly diverted. We are not in agreement with H. We think it might be I." When asked if the defense was admitting to any of the entries, counsel responded, "Only Sedgwick County driving without proof of insurance. None of the municipal court convictions." The only nonmunicipal conviction for driving without proof of insurance in the PSI was entry number 5. The court then asked counsel about entries 4 and 5, which were both Sedgwick County (nonmunicipal) convictions. Counsel replied, "I think that's correct, Your Honor. But I think two convictions takes him into the H box. One conviction is the I box. I think it's probably accurate he does have two county convictions, but I'm not prepared to stipulate to that at this time."

The State explained that it did not know if entries 4 and 5 would put Komakech in a criminal history score of H, and it "would have had something" had the defense raised a challenge before the sentencing hearing. After a brief recess, defense counsel opined more about the situation and concluded that, "Although I don't want to stipulate to the criminal history, I would say there is sufficient evidence to end up in the H box." The district court asked if that was based on a conversation between the attorneys, and defense counsel responded, "Documents provided by the State." The State responded that it "ha[d] those documents" and could offer them as exhibits "if the Court would like." The State then provided information about three of the entries in the PSI. The State offered to provide documents in support, but the court stated, "I'm fine with your representation. Counsel is stipulating."

The district court then asked defense counsel whether he was stipulating that there were "at least two" offenses that could be considered and scored for criminal history purposes, and counsel replied, "I'm stipulating to one and I'm not contesting the proffer of the State." The court stated, "All right. I think that's good enough. . . . The State is not waiving the right to prove up that criminal history at a later date. I'll note that."

15

Komakech then personally admitted his criminal history score was H. The court made findings that Komakech was an H criminal history score and that "no DL in possession"—entry 4—was a misdemeanor and not an infraction. The district court proceeded to sentence Komakech based on that criminal history.

On appeal, Komakech argues that the PSI entry 4 (no driver's license) and entry 5 (no proof of insurance) were improperly included as part of his criminal history score. He argues that entry 4, which was a violation of K.S.A. 8-244 (Furse 2001), was an unclassified misdemeanor and should not have counted towards his criminal history score. He argues that entry 5, which was a violation of K.S.A. 40-3104, was a class B nonperson misdemeanor and that it should not have been counted towards his criminal history score unless it occurred within three years of a prior conviction. See K.S.A. 40-3104(g). Thus, according to Komakech, entry 5 should not have served as a basis for increasing his criminal history score.

An appellate court reviews a district court's decision that the State met its burden to prove the classification of a prior conviction for substantial competent evidence. *State v. Corby*, 314 Kan. 794, 796, 502 P.3d 111 (2022). To the extent this review requires statutory interpretation, its review of those statutes is unlimited. *State v. Bryant*, 310 Kan. 920, 921, 453 P.3d 279 (2019).

Under K.S.A. 21-6814(a), an offender may admit to criminal history in open court or the sentencing court will determine criminal history by a preponderance of the evidence at the sentencing hearing. See *Corby*, 314 Kan. at 797. A defendant's admission to criminal history serves as an admission to the existence and classification of prior convictions, relieving the State of its burden of presenting additional evidence. 314 Kan. at 797-98. However, when a defendant exercises the statutory right to challenge the accuracy of the convictions contained in the criminal history worksheet at the time of sentencing, the State bears the burden to prove by a preponderance of the evidence that

16

the defendant committed the crime. K.S.A. 21-6814(c); *State v. Daniels*, 319 Kan. 340, 347, 554 P.3d 629 (2024) (stating that opportunity to challenge accuracy of conviction in criminal history worksheet "is procedurally specific and time sensitive"). Thus, a defendant either "admits to criminal history," or absent the admission, "the court determines criminal history by the preponderance of the evidence." *Corby*, 314 Kan. at 797.

Under these circumstances, Komakech raised some objections to the convictions and classifications then apparently stipulated to the ultimate score. The State presented no evidence supporting the criminal history (although it offered). This court finds no reason to disagree with the parties that Komakech's criminal history score was not sufficiently proven at sentencing. Despite Komakech's attempts to generally challenge his criminal history at sentencing without lodging a specific objection, under these circumstances, he can still challenge the legality of his sentence based on an error in the classification of a prior conviction. See *State v. Dickey*, 301 Kan. 1018, 1032, 350 P.3d 1054 (2015) (clarifying that a lack of objection regarding conviction classification will not prevent a subsequent challenge that his sentence is illegal); see also *Corby*, 314 Kan. at 797-98 (noting defendant did not raise claim that classification was illegal).

Given the nature of Komakech's objections and partial stipulations to his criminal history score at sentencing and the State's agreement on appeal that remand is proper—Komakech's sentence is vacated and the case is remanded for reconsideration of his criminal history score. On remand, the district court is permitted to consider any evidence that will assist it in making a finding, including the State's evidence purportedly supporting the criminal history score. Because Komakech admitted to having a criminal history H at sentencing, he carries the burden on remand. See K.S.A. 21-6814(c); *State v. Daniels*, 319 Kan. at 348.

17

Komakech unconvincingly claims the State presented insufficient evidence to support his conviction for aggravated criminal sodomy. Contrary to Komakech's arguments, the forced sexual act in this case fits the statutory definition of sodomy and the victim's testimony is not so incredible that no reasonable factfinder could find him guilty beyond a reasonable doubt. Finally, as both parties agree, additional information is necessary to ensure that Komakech's criminal history score was accurately assessed.

Komakech's conviction is affirmed, his sentence is vacated, and the case is remanded for reconsideration of his criminal history score.

Conviction affirmed, sentence vacated, and case remanded with directions.